AMEER SIDDIQUI,

       Plaintiff,

vs.

NETJETS AVIATION, INC.,

       Defendant.

_____/

## ORDER

**THIS MATTER** is before the Court on the Parties' competing motions for summary judgment. After careful review of the briefing and record in this case, and with the benefit of oral argument, the Court enters final summary judgment for Defendant on all claims.

## I.    BACKGROUND[1]

### A.    <u>The Parties</u>

Plaintiff Ameer Siddiqui is a Muslim of Pakistani descent. (DE 42-1, Pl.'s Statement of Material Facts (PSMF) ¶ 1). Mr. Siddiqui has worked as a pilot in the aviation industry since 1995, when he began working as a flight instructor in New York. (*Id.*). His former employer, Defendant NetJets Aviation, Inc., is the nation's largest fractional aircraft ownership company, with the largest private jet fleet in the world. In 2006, Mr. Siddiqui

---

[1] This section includes the relevant admitted facts for purposes of summary judgment. In their respective statements of material facts, the Parties provided various assertions that are supported by the record. In some instances, the Parties did not contest their adversary's assertions. In other instances, the Parties contested their adversary's assertions but without citing sufficient materials in the record to refute those assertions. The Court will deem all of these uncontested—or insufficiently contested—factual assertions to be admitted. *See* S.D. Fla. L.R. 56.1(b); Fed. R. Civ. P. 56(c), (e).

began working as a pilot for NetJets in its Citation Excel/XLS fleet. (DE 45, Def.'s Statement of Material Facts (DSMF) ¶ 1). Mr. Siddiqui flew private jets for individual "owners" (NetJets' name for its clients) primarily from the West Palm Beach location until NetJets suspended him from flying in September 2013.

## B. The Anonymous Call – Late 2012 / Early 2013

In late 2012 or early 2013, Joseph Dalton, NetJets' Director of Aviation Security, received an anonymous call about Mr. Siddiqui. (DSMF ¶ 2; PSMF ¶ 3). According to Dalton, the anonymous caller was a NetJets' crewmember who was very concerned something would occur involving Mr. Siddiqui in the cockpit of a NetJets' aircraft. (DSMF ¶ 3; DE 45-3). The caller stated that Mr. Siddiqui had made statements that were offensive to certain religious groups and persons of certain national origins. (*Id.*). Specifically, Mr. Siddiqui had commented that the September 11 attacks were a conspiracy and did not happen the way everyone believed. (*Id.*). Mr. Siddiqui also spoke negatively about individuals of Jewish faith. (*Id.*). The caller relayed that another crew member had told his wife that if he were ever flying with Mr. Siddiqui and did not come home, the wife should know it was related to Mr. Siddiqui. (*Id.*). Dalton reported the call to NetJets' legal and labor relations departments. (*Id.*).[2]

---

[2] In response to NetJets' statement of material facts, Plaintiff argued that the anonymous call is non-admissible hearsay that should not be considered on summary judgment. The Court disagrees. First, Plaintiff included the anonymous call in his own statement of material facts. (PSMF ¶ 3). He has therefore waived his objection to having the call considered as part of the record on summary judgment. In addition, the call is not being considered for the truth of the matter asserted. Instead, the call is considered for its effect on NetJets—the impetus for its investigation—and as evidence of NetJets' lack of discriminatory animus.

## C. NetJets' Initial Interviews

In January 2013, David Hyman, Chief Pilot of the Citation Excel/XLS fleet, and Anthony Mosso, NetJets' Labor and Employee Relations Manager, investigated the anonymous caller's allegations about Mr. Siddiqui. (*Id.* ¶ 4). Hyman and Mosso conducted telephone interviews of four crewmembers who had recently flown with him: Jeff Lindley, Gary Cox, Rick Price and Jim Rivera. (*Id.* ¶ 5). NetJets did not notify Mr. Siddiqui of the interviews. (PSMF ¶ 4).

Hyman typed summaries of the interviews on January 11, 2013, and sent them to Eric Lampert, VP/Director of Operations, and Jennifer Beale, Assistant General Counsel. (DSMF ¶ 6). Hyman's notes state the following:

- Lindley said he was unwilling to speak freely about the details of his conversations with Mr. Siddiqui. But Lindley did say that while "he did not agree with [Mr. Siddiqui]'s perspective on Middle Eastern politics, [] he wasn't offended or taken aback by anything that was said during the course of [his] tour" with Mr. Siddiqui.

- Cox told Hyman and Mosso "specific details" of his conversations with Mr. Siddiqui that "indicate[d] strong anti-Israeli, if not anti-Semitic leanings." Regarding the Palestinian conflict, Cox alleged that Mr. Siddiqui had said, "how would you like it if someone kicked you out of your home?" Mr. Siddiqui also shared the viewpoint that Al Qaeda was not responsible for taking down the World Trade Center buildings. Cox, however, also "stated he was not offended or concerned by the conversations he had with" Mr. Siddiqui. Hyman's "take" from interviewing Cox was "that there were political views and [Cox] disagreed with them, but [Cox] could fly with [Mr. Siddiqui]."

- When Hyman first mentioned Mr. Siddiqui's name to Price, Price's "first words were, 'he worries me.'" Although Price "could not remember specific comments, he did say that [Mr. Siddiqui] expressed such anti-America / pro-Arab sentiments, that it made [him] 'nervous.'"

- Rivera told Hyman and Mosso that Mr. Siddiqui is a "big time conspiracy theorist" who had expressed that the U.S. Government and the Jewish people were responsible for bringing down the World Trade Center to blame it on Pakistan so they could take away Pakistan's nuclear weapons. According to Rivera, Mr. Siddiqui also had stated that the Taliban are "just a group of scholars."

Rivera also described Mr. Siddiqui as an "extreme anti-Semite." He said Mr. Siddiqui would frequently respond to news stories by stating, "You see, it's the Jews!" According to Hyman's notes, "Rivera's opinion is that [Mr. Siddiqui] is 'fertile ground' for Islamic extremism due to his frequent trips to Pakistan and his unabashed hatred of Israel and the U.S."

Rivera told Hyman and Mosso about two incidents when Rivera and Mr. Siddiqui were flying a passenger with "a Jewish sounding name." During one trip, Mr. Siddiqui showed Rivera the passenger manifest and said, "See her last name? She is related to one of the families responsible for persecuting the Palestinians in Israel." On another trip, Mr. Siddiqui stated that the passenger, whom Mr. Siddiqui believed was Jewish, had conspired with the U.S. government to destroy the World Trade Center for the purpose of implicating Pakistan. Rivera also recounted an incident when he and Mr. Siddiqui were eating breakfast in a hotel in Atlanta while they were both in uniform. Mr. Siddiqui became very angry about a news story that was on the television while they ate. The story, which related to an American policy, sparked Mr. Siddiqui's anger and he became very loud and demonstrative in expressing his anti-American perspective. When the waitress, who was from Africa, approached their table, Mr. Siddiqui spoke loudly to her regarding America's oppression of people from that region in order to seize their oil. Mr. Siddiqui was so loud that Rivera had to intervene to calm and quiet him down.

(DE 45-5). Based on these preliminary interviews, NetJets decided to conduct additional and more in-depth interviews. (DSMF ¶ 14). Beale prepared follow-up questions for the four pilots and emailed them to Mosso on February 4, 2013. (*Id.*).

### D. Follow Up Interviews

The follow up interviews did not occur until six months later, in mid-August. (*Id.* ¶ 15). Moss and Hyman re-interviewed, via telephone, pilots Cox, Price and Rivera. (*Id.*; DE 45-7). Hyman's notes of these follow up calls reflect that Cox reaffirmed that Mr. Siddiqui told him on multiple occasions that he believed September 11 was a plot perpetrated by the US Government. (DE 45-7). Cox also recalled conversations with Mr. Siddiqui regarding trips Mr. Siddiqui made to Pakistan due to his arranged marriage to a Pakistani woman. (*Id.*). Cox stated, however, that he did not have any safety concerns with Mr. Siddiqui. (*Id.*). During his second interview, Price again said that Mr. Siddiqui

expressed an anti-American perspective, but he could not recall specific comments or provide further detail. (*Id.*). Rivera, for his part, reiterated that he was nervous when he first started flying with Mr. Siddiqui. (*Id.*). "As an example, [Rivera] described an occasion when he contacted his wife to warn her that if something happened to the aircraft (and crew), it would be related to [Mr. Siddiqui] and his political beliefs." (*Id.*). But Rivera also suggested that Mr. Siddiqui was "basically harmless." (*Id.*).

Mosso and Hyman also interviewed a fifth pilot, Joe Wottreng. (DSMF ¶ 16). Wottreng stated that Mr. Siddiqui told him the September 11 attacks were perpetrated to prevent Pakistan from obtaining nuclear weapons, and that Mr. Siddiqui would "talk politics with anyone who will listen." (DE 45-7). He further stated that Mr. Siddiqui made the comment several times that the U.S. military are "the 'true terrorists.'" (*Id.*). Wottreng also noted that Mr. Siddiqui had traveled to Pakistan multiple times. (*Id.*). Wottreng said, however, that he "ha[d] no safety concern with Mr. Siddiqui." (*Id.*). And Hyman's notes of these follow up interviews state that "ultimately all people interviewed felt that [Mr. Siddiqui] is not a threat to passengers, equipment or crew. The general sentiment is that he likes to hear himself talk, but quickly cuts off the rant when asked to do so by his fellow crewmember." (*Id.*).

About two weeks later, Hyman, Mosso and Beale conducted telephone interviews of two additional pilots, Joseph Parks and Scott Davis. (*Id.* ¶ 21). Beale prepared typed summaries of the interviews. (*Id.*; DE 45-11). According to her notes, Parks stated that he had not heard any pilots in his fleet make any racist or anti-Semitic remarks, and that Mr. Siddiqui never "had made any comments about Jewish passengers." (DE 45-11). But Parks did say that Mr. Siddiqui made comments about Jews being responsible for

5

September 11 and other world problems. (*Id.*). Parks also said, "[Mr. Siddiqui] told him that he ([Mr. Siddiqui]) was questioned by the CIA or FBI after the world trade center bombings." (*Id.*). When asked if he felt Mr. Siddiqui was a safety risk, Parks said, "I really don't know. If I had the choice, I'd rather fly with [another pilot], but [Mr. Siddiqui] didn't preach anything . . . I know it's kind of vague, but we got along pretty good . . . we had dinner together a couple of nights. He wasn't reclusive or preaching to me." (*Id.*). Parks also said during the phone interview that "he has heard from other people who have flown with [Mr. Siddiqui] that he ticked them off, but he can't remember specifically who right now." (*Id.*). Parks further noted he "goes back to Pakistan/India all the time. . ." (*Id.*).

During his interview, Davis said it had been a while since he had flown with Mr. Siddiqui, but he did "have some questions . . . And in talking with other pilots we've shared the same sentiment." (*Id.*). Although he could not recall specific comments, he recalled one particular flight where they were picking up a Jewish passenger and Mr. Siddiqui said something negative—he couldn't remember the exact wording but said "If I were Jewish I would have been offended." (*Id.*). Davis also said he had heard that "apparently [Mr. Siddiqui] took a leave of absence to go back to Pakistan for a few months and some people felt he picked up a lot of Anti-American sentiment while over there. . . ." (*Id.*).

## E. NetJets Places Mr. Siddiqui On Administrative Leave And Refers Him To The FBI

Toward the end of August, Beale emailed a summary of Mr. Siddiqui's employment history[3] and the notes from the January 2013 preliminary interviews and the August 2013

---

[3] Beale's summary of Mr. Siddiqui's employment history indicates that NetJets' leave information did "not indicate whether [Mr. Siddiqui] went to Pakistan while on leave." At deposition, Noe was asked: "Would it make a difference if [Mr. Siddiqui] had taken many trips to Pakistan?" He responded: "It was one piece of the overall picture. . . . It didn't

6

follow-up interviews to William Noe, NetJets' President and Chief Operating Officer. (DSMF ¶ 18). Based on this information, and after discussing Mr. Siddiqui's actions with Colleen Nissl and Eric Lampert (VP/Director of Operations), Noe decided to place Mr. Siddiqui on administrative leave. (*Id.* ¶ 19). Noe testified that it is NetJets' practice to put an employee on paid administrative leave while NetJets investigates any issues raised about that employee. (DSMF ¶ 20). Noe stated that employees are placed on leave for two reasons: 1) to determine whether the information is credible, and 2) for safety reasons. (*Id.*). According to Noe, it is not fair for individual crew members "to know that they are being scrutinized or investigated and then put them back out in the airplane and expect them not to be distracted thinking about it." (*Id.*).

On September 7, 2013, Mr. Siddiqui received an email from then-Assistant Director of Flight Operations, Brent Owens, informing him that NetJets had placed him on paid administrative leave as of September 7, 2013, while NetJets "investigate[d] allegations of security concerns." (DSMF ¶ 22; PSMF ¶ 5). Mr. Siddiqui was directed to report to NetJets' headquarters in Columbus, Ohio, two days later for a meeting regarding his suspension. (PSMF ¶ 5). During the meeting, he met with Moss, Brent Owens, and NetJets Association of Shared Aircraft Pilots ("NJASAP") union representative Paul Konrath. (PSMF ¶ 5-6). Mr. Siddiqui was asked to return his aircraft key and badge. (*Id.*).

That day, Dalton and Ron Brower, NetJets' Corporate Secretary and Associate General Counsel, met with the FBI Columbus Joint Terrorism Task Force regarding Mr.

---

have an impact." Noe also testified that NetJets looked into whether Mr. Siddiqui had flown to Pakistan to "fact check[] the various parts of information that had come from other pilots regarding [Mr. Siddiqui] to see if there was any credibility to those statements." (DE 45-10 at 96-98). These assertions are uncontradicted.

Siddiqui's conduct and statements. (DSMF ¶ 24). According to NetJets, it waited for the FBI to complete its investigation before taking any further action on Mr. Siddiqui's case. (*Id.* ¶ 25).

On December 5, 2013, the FBI contacted Mr. Siddiqui seeking to meet with him. (PSMF ¶ 9). Mr. Siddiqui agreed to meet that evening. (*Id.*). During the meeting, the two FBI agents questioned Mr. Siddiqui generally about terrorism, September 11, his divorce, and other pilots; they also disclosed that NetJets had contacted the FBI to open an inquiry into him. (*Id.*). The FBI agents assured Mr. Siddiqui the meeting was not part of any investigation, and that they were merely following up on an inquiry. (*Id.*). The agents indicated they would notify Joseph Dalton, NetJets' Director of Aviation Security, that the FBI would be closing the inquiry. (*Id.*). The FBI's inquiry concluded in approximately February 2014; it found no reason for concern or further action, and it conveyed this conclusion to NetJets in early 2014. (*Id.*; DE 45-10 at 84:14-85:2).

## F.     **Mr. Siddiqui's Extended Administrative Leave**

From 2014 to 2015, Mr. Siddiqui remained on administrative leave and could not fly for NetJets. (PSMF ¶ 10). He continued working as an aircraft mechanic for American Airlines during this time. (*Id.*). Although NetJets paid Mr. Siddiqui his full salary, benefits, and a bonus during this leave, Mr. Siddiqui claims the length of the leave has had severe repercussions for his career. (DSMF ¶ 47; PSMF ¶ 10). For instance, because he had no permission to fly or otherwise meet his flight training requirements, he claims he lost opportunities for training and continuing education necessary to meet regulatory requirements for flying as a pilot. *See* (DE 81). He also alleges that he became ineligible to keep the training required to maintain active flight status. (*Id.*; DE 48).

According to NetJets, Mr. Siddiqui's case did not progress in 2014 because its management was engaged in contentious negotiations with the pilots' union and two other employee groups. (DSMF ¶ 26). These negotiations occupied a large amount of time for NetJets' employees in the labor relations department, including Mark Okey, who was Vice President for Labor Contract Compliance. (Id.). Okey and others in the department were responsible for conducting crewmember review boards ("CRBs") for more serious matters, such as Mr. Siddiqui's.[4] (Id.). In the same time period, however, NetJets' Labor Department was able to marshal the personnel and resources to conduct other CRBs, although those involved different charges of misconduct. See (DE 48 ¶ 26; DE 42-2 at 183-86; DE 47-1). In addition to the union negotiations, NetJets identifies several key management changes at NetJets that it claims delayed the scheduling of Mr. Siddiqui's CRB. (DSMF ¶ 27). Alan Bobo took over as the Director of Operations, the position ultimately responsible for management of the flight crews and regulatory and compliance operations, in July 2015. (Id.). A new president started at NetJets in 2015 as well. (Id.).

## G.    Mr. Siddiqui's Crewmember Review Board

In January 2015, NetJets began the process of scheduling a CRB for Mr. Siddiqui. (DSMF ¶ 28). A CRB consists of three to five employees from various NetJets departments assembled to investigate matters concerning crewmembers, including pilots. (Id. ¶ 29). During the CRB, the board members interview the employee in the presence of his or her union representative. (Id.).

---

[4] Mr. Siddiqui contests the implication that these negotiations prevented the Labor Department from scheduling or conducting his or anyone else's CRB.

On February 16, 2015, Mr. Siddiqui's counsel at the time sent a letter to NetJets' in-house counsel, seeking information about Mr. Siddiqui's employment status, and an explanation for the delay in resolving any issues related to that status. The letter also raised Mr. Siddiqui's concerns about potential discrimination and retaliation. NetJets responded on March 2, 2015, asserting it would not discuss such matters and that, in any event, it does not discriminate or retaliate against employees such as Mr. Siddiqui. (PSMF ¶ 11; DE 42-2 at 103).

On March 29, 2015, Mr. Siddiqui was asked to travel to Columbus, Ohio, to attend a CRB hearing scheduled for April 1, 2015. (DSMF ¶ 30). Mr. Siddiqui was advised that the CRB was investigating his alleged inappropriate statements relating to owners and/or violations of NetJet's Professional Conduct and Prohibition Against Harassment Policy. (*Id.*). The notice advised Mr. Siddiqui that these alleged inappropriate statements included anti-Semitic comments and derogatory statements about national origin.[5] (*Id.*).

The CRB hearing occurred on April 1, 2015. (*Id.* ¶ 31). The panel consisted of Erica Leighton, Dan Driscoll, Trent Edwards, and Mark Okey. (DE 45-18). Mr. Siddiqui was represented by union attorney Sonya Cook and union steward Mike Monkevicz. (DSMF ¶ 31). At the start of the CRB hearing, Okey advised Mr. Siddiqui about the importance of integrity and the board's expectation of complete honesty. (*Id.* ¶ 32). Okey also told Mr. Siddiqui that lying is "a separate and distinct reason for discipline at NetJets, up to and including discharge." (*Id.* 32). Mr. Siddiqui indicated he understood. (*Id.*).

---

[5] The email to Mr. Siddiqui notifying him of the CRB referenced "inappropriate statements relating to owners and/or violations of [Defendant's policy regarding harassment], including, but not limited to, derogatory statements regarding different religions (anti-Semitic comments) and national origins." (DE 45-30).

Mr. Siddiqui was asked a series of questions during the CRB about whether he had made specific types of statements. (*Id.* ¶ 33). He was asked about his comments regarding Jews, the Jewish religion, NetJets' passengers whom Mr. Siddiqui assumed or knew to be Jewish, the September 11 attacks, and the U.S. military's alleged terroristic role. (*Id.*; DE 45-18). In response to the panel's questions, Mr. Siddiqui repeatedly denied making any statements described by the pilots who had been interviewed. (*Id.* ¶ 34; DE 45-18). After a break in the CRB hearing, during which Mr. Siddiqui had the opportunity to consult with his union representatives, Mr. Siddiqui again categorically denied making the inappropriate comments. (*Id.* ¶ 35).

After the CRB, because Mr. Siddiqui had denied making any of the statements at issue, CRB member Erica Leighton again contacted the pilots who were originally interviewed to confirm their recollection of Mr. Siddiqui's actions and confirm their prior accounts. (*Id.* ¶ 37). In addition, the CRB members prepared a Report of Investigation (ROI) after concluding their work. (DSMF ¶ 38; DE 45-19). Based on the "confirmations by fellow crewmembers, [Mr.] Siddiqui's behavior at the review board meeting, the consistency of the witnesses, and the lack of evidence that the persons interviewed colluded in any way, the Board concluded that Mr. Siddiqui was not honest during his in-person review board, and that he did make anti-Semitic and other offensive and concerning remarks during periods of duty and/or while in uniform and representing NetJets." (*Id.*). The Board unanimously decided to fire Mr. Siddiqui. (*Id.*).

### H.    Mr. Siddiqui's Termination

On April 19, 2015, Mr. Siddiqui filed a charge of discrimination with the EEOC, alleging that NetJets had kept him on administrative leave because of his race, religion,

and national origin and retaliated against him for engaging in protected conduct. (PSMF ¶ 16). On May 11, 2016, the EEOC issued a Dismissal and Notice of Rights, which indicated that "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained established violations of the statutes." (*Id.* ¶ 17).

On May 24, 2016, Beale emailed Sonya Cook, Mr. Siddiqui's union representative, inquiring whether Mr. Siddiqui had any renewed interest in reaching a settlement before NetJets took action based on the CRB hearing. (DSMF ¶ 41). The parties engaged in settlement discussions during June and July of 2016. (*Id.* ¶ 42). After an impasse was reached, Bobo made the decision to discharge Mr. Siddiqui. (*Id.* ¶ 43). Bobo discussed the matter with Bill Noe and reviewed the CRB panel's ROI. (PSMF ¶ 19; DE 50 ¶ 19). Bobo testified that he did not know at the time that the FBI had closed its inquiry into Mr. Siddiqui or that NetJets, and not the FBI, had initiated that inquiry in the first place. (PSMF ¶ 19). Bobo also testified that Noe made it "very clear" that "Mr. Siddiqui would no longer be able to be employed [in] a pilot capacity." (*Id.*).

NetJets fired Mr. Siddiqui by sending him a termination letter on August 11, 2016. (DSMF ¶ 44). The letter states that he was terminated for making anti-Semitic and other offensive comments, failing to acknowledge his inappropriate conduct, and for lying about making those comments during the CRB hearing. (*Id.*; DE 45-24).

On August 17, 2016, the union filed a grievance challenging the sufficiency of the termination letter to Mr. Siddiqui, including, in part, that NetJets had not provided enough detail to Mr. Siddiqui as to the underlying events allegedly forming the basis of his discharge. (DSMF ¶ 48; DE 45-27). On August 24, 2016, NetJets issued a supplemental termination letter to Mr. Siddiqui, which added that the alleged statements were made "on

multiple occasions prior to [his] placement on paid administrative leave, including but not limited to duty tours in 2012[,]" and that his purported "dishonesty occurred, at minimum, during the related CRB interview on April 1, 2015." (DSMF ¶ 49; DE 45-28).

Following his discharge, Mr. Siddiqui filed a grievance with the union on September 9, 2016, alleging he was terminated without "just cause." (DSMF ¶ 50). He filed this lawsuit on September 13, 2016 (DE 1), and then filed a second charge of discrimination with the EEOC on September 22, 2016. (DSMF ¶ 52-54). Mr. Siddiqui's grievance was arbitrated on August 8 and 17, 2017. (*Id.*). In December 2017, the arbitration panel issued its decision finding that NetJets' termination of Mr. Siddiqui was for just cause. (*Id.*).

In this case, Mr. Siddiqui alleges NetJets discriminated against him based on his race, religion, and national origin, and retaliated against him for complaining about this discrimination, by suspending him, extending his suspension, and firing him.

## II. APPLICABLE LAW

### A. <u>Summary Judgment Standard</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits

or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a sufficient showing to establish the existence of an element essential to [his] case, and on which [he] will bear the burden at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997).

## B.  Plaintiff's Title VII And Section 1981 Discrimination Claims

The parties agree that case is based on circumstantial, not direct, evidence. Cases based on circumstantial evidence utilize the *McDonnell Douglas* analysis, under which a plaintiff bears the initial burden of establishing the elements of his *prima facie* case of discrimination.[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). To

---

[5] When § 1983 is used as a parallel remedy for violation of Title VII, the elements of the two causes of action are the same. *Cross v. Alabama, State Department of Mental Health & Mental Retardation*, 49 F.3d 1490, 1508 (11th Cir. 1995). Identical methods of proof, as described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), are used.

establish a *prima facie* case of discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class. *Maynard v. Board of Regents of the Division of Universities of the Florida Department of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003). To establish a *prima facie* case of retaliation, a plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there is some causal relationship between the two events. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

If a plaintiff establishes a *prima facie* case, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employer's actions. *McDonnell Douglas*, 411 U.S. at 802-03. If the employer offers such a reason, the burden shifts back to the plaintiff to show that the employer's reason was pretext for prohibited discrimination. *Id.* at 804.

To avoid summary judgment on employment discrimination and retaliation claims, the plaintiff must introduce significantly probative evidence that both the proffered reason for the adverse employment action is false and discrimination is the real reason for the action. *Brooks v. County Commission of Jefferson County, Alabama*, 446 F.3d 1160, 1163 (11th Cir. 2006). To do this, a plaintiff must "demonstrate[] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them

---

*Richardson v. Leeds Police Department*, 71 F.3d 801, 805 (11th Cir. 2000). So if Plaintiff fails to establish his Title VII claim, his § 1983 claim also fails.

unworthy of credence." *Jackson v. State of Alabama State Tenure Commission*, 405 F.3d 1276, 1289 (11th Cir. 2005). "The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Rioux, Ga.*, 520 F.3d at 1278. Thus, "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its actions." *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (citations omitted).

## C.   Plaintiff's Retaliation Claims

"[R]etaliation claims must be proved according to the traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas v. Nassar*, 133 S. Ct. 2517, 2533 (2013).

Title VII, Section 1981 and the ADEA "have the same requirements of proof and use the same analytical framework" for determining whether a plaintiff has made a *prima facie* showing to survive summary judgment. *Barnett v. Athens Reg'l Med. Ctr., Inc.*, 550 Fed. Appx. 711 (11th Cir. 2013). To establish a *prima facie* retaliation case, Mr. Siddiqui must show that: (1) he participated in a protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Barnett*, 550 Fed. Appx. at 714 (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir.1993)). Ultimately, if NetJets articulates a legitimate, non-discriminatory reason for its actions, Mr. Siddiqui must show, by a preponderance of the evidence, that the proffered reasons were

pretextual. *See Beach v. JPMorgan Chase Bank NA*, 218 F. Supp. 3d 1367, 1373 (S.D.

Fla. 2016) (citing *Walker v. Mortham*, 158 F.3d 1177, 1184 (11th Cir. 1998)).

## III.    ANALYSIS

Both Parties seek summary judgment on Plaintiff's discrimination and related

retaliation claims. Plaintiff's claims are based on two NetJets employment actions against

him: placement on (and continuation of) administrative leave, and termination of

employment. In its motion for summary judgment, NetJets argues it is entitled to judgment

on Plaintiff's claims for four reasons. NetJets first argues that paid administrative leave

does not constitute an adverse employment action, and thus cannot give rise to a

discrimination or retaliation claim. NetJets next asserts that Plaintiff cannot establish a

*prima facie* case of discrimination because he cannot demonstrate that he received less

favorable treatment than similarly situated employees outside his protected class. And

even if Plaintiff could demonstrate a *prima facie* case, NetJets argues, his discrimination

and retaliation claims also fail because he cannot show that NetJets' proffered reasons

for placing and keeping him on administrative leave and subsequently terminating him

were pretextual. Finally, NetJets argues that Plaintiff's retaliation claim fails for the

additional reason that he cannot show a causal link between his alleged protected

conduct and his termination.

After carefully considering the Parties' briefing, the record, and applicable law, the

Court finds that Plaintiff has not presented sufficient evidence to show that NetJets'

proffered non-discriminatory reasons for Plaintiff's administrative leave and termination

were pretextual. As a result, the Court need not address in depth the merits of Plaintiff's

*prima facie* showing of discrimination and retaliation.[6] *See Soulinthong v. TrustPoint Int'l, LLC*, 695 F. App'x 474, 476 (11th Cir. 2017) (declining to address plaintiff's *prima facie* case because "even if [she] established [one], summary judgment on [her] claims was proper because she failed to establish pretext").

## A.     Plaintiff's Discrimination Claims Fail: He Cannot Show Pretext

Before turning to pretext, the Court finds that NetJets has met its burden to articulate legitimate, non-discriminatory reasons for its actions. *See McDonnel Douglas*, 411 U.S. at 802-03. This burden is "exceedingly light." *Turner v. AmSouth Bank, NA*, 36 F.3d 1057, 1061 (11th Cir. 1994). NetJets claims it originally placed Plaintiff on administrative leave because of security concerns arising from alarming comments he had made about the September 11 attacks and people of Jewish faith, and because of concerns raised by fellow pilots and crewmembers. NetJets has also stated that it generally places pilots on leave while they are being scrutinized or investigated so that they are not distracted while flying. As for the duration of Plaintiff's leave, NetJets claims it was due to several legitimate, non-discriminatory reasons, including that NetJets was awaiting the outcome of the FBI's investigation; that its management was involved in contentious negotiations with the pilots' union and other employee groups, consuming much of the labor relations department's time; and that there were several changes in key management positions at NetJets. Finally, NetJets asserts that it terminated Plaintiff because the four-person crewmember review board assigned to his case unanimously

---

[6] The Court also assumes, without deciding, that under the circumstances present here—administrative leave extending nearly three years; lost opportunities for required training; and a serious "red flag" placed in his permanent employment file—NetJets' placement of Mr. Siddiqui on administrative leave and its continuation of that leave constitute an actionable adverse employment action.

determined that Plaintiff had made the offensive and concerning comments while on duty, and then lied about making those comments when questioned during his CRB.

The Court finds that these arguments—which are supported by sufficient record evidence (*see supra*, at 2-12)—fulfill NetJets' intermediate burden of offering legitimate, non-discriminatory reasons for its actions. *See Lopez v. AT&T Corp.*, 457 Fed. Appx. 872, 874 (11th Cir. 2012) (proffered reason is legitimate and non-discriminatory if it is one that "would motivate a reasonable employer"); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) ("To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."); *see also Rodriguez v. Cargo Airport Srvcs. USA, LLC*, No. 14-CV-22610-WILLIAMS, 2015 WL 13016400, *7 (S.D. Fla. Aug. 5, 2015) ("A violation of company rules is a legitimate, non-discriminatory reason for firing an employee.") (internal citations omitted).

The burden therefore shifts to Plaintiff to show that these reasons are a mere pretext for unlawful discrimination and retaliation. To establish pretext, Plaintiff first argues that similarly situated NetJets' employees outside his protected class were treated more favorably. Next, he claims NetJets offered reasons for its actions that are inconsistent with its findings for placing him on administrative leave; provided shifting explanations for its decision to ultimately terminate him; and departed from its typical procedures for assessing and meting out discipline. Because Plaintiff has not presented sufficient evidence substantiating these arguments and showing that "it is more likely than not" that NetJets was motivated by unlawful animus, the Court is compelled to grant summary judgment for NetJets.

### i. Plaintiff's Comparator Evidence Does Not Create A Genuine Issue Of Material Fact On Pretext

Comparator evidence can demonstrate pretext only when a plaintiff shows that he and the other employee(s) are similarly situated in all relevant respects, including that they are involved in or accused of the same or similar conduct and are disciplined in different ways. *Holifield*, 115 F.3d at 1562. Misconduct that is merely "similar" to the misconduct of the disciplined plaintiff is insufficient (*Rioux*, 520 F.3d at 1280); "[t]he quantity and quality of the comparator's misconduct [must] be nearly identical" to that of the plaintiff. *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). This insistence on nearly identical conduct is critical "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia*, 171 F.3d at 1368; *see also Rioux*, 520 F.3d at 1280. Applying this standard, the Court finds that Plaintiff's purported comparators are not sufficiently similar and cannot create a genuine issue of material fact regarding NetJets' proffered reasons for its employment actions.

Plaintiff proposes these four white, non-Muslim pilots as comparators:

- Pilot and First Officer A. Dekker. He made inappropriate racial remarks during a breakfast with a coworker in November 2015, and ultimately received a seven-day suspension and warning letter. A CRB was convened approximately one month after the alleged incident. NetJets issued its final report within five weeks of the incident.

- Pilot and Captain M. McNatt. He made an inappropriate comment about the Supreme Court's same-sex marriage decision and told a racist joke in front of coworkers. The incident occurred on June 25, 2015, and NetJets convened a CRB on August 25, 2015. NetJets recommended a fourteen-day suspension approximately three weeks later.

- Pilot and Captain R. "Brad" Donwerth. He was accused of poor performance during flight checks, and of having a poor attitude toward coworkers. Approximately five months after the alleged incidents—which included emails

from NetJets employees describing Donwerth's flight performance issues—NetJets recommended additional training and supervision on Donwerth's upcoming flights.

- An "unnamed pilot." He was reinstated after being acquitted of criminal charges. NetJets put him on leave in July 2011, and reinstated him in March 2013.

(DE 42-2 at 178-203).

These individuals are not proper comparators: None of them are substantially similar to Plaintiff as the applicable caselaw requires. *See e.g., Blow v. Virginia College*, 619 Fed. Appx. 859, 862 (11th Cir. 2015) (granting summary judgment because plaintiff's proffered comparators were not accused of the same or similar conduct as plaintiff). Dekker and McNatt are not similarly situated to Plaintiff because neither the quality nor the quantity of their conduct was "nearly identical" to his. In Dekker's case, he made two offensive comments on a single day and had no prior incidents of similar conduct. (DE 42-2 at 179-81; DE 49-1). He admitted his behavior and acknowledged it was inappropriate, repeatedly apologized to his fellow crewmember, and was embarrassed and contrite about his actions. (*Id.*). Based on these factors, Director of Operations Alan Bobo determined that a final written warning, a seven duty-day unpaid suspension and mandatory sensitivity training, rather than termination, was the appropriate discipline. (*Id.*)

In McNatt's case, his offensive comments were also limited to a single day, he had no prior similar incidents, and he apologized to the crewmember he offended. (*Id.* at 183-86; DE 49-1). Although McNatt did not recall making the comments, he had apologized at the time of the incident and indicated that he was sorry if he had offended anyone. (*Id.*). Bobo determined that a final written warning and a fourteen duty-day unpaid suspension, as opposed to termination, was the appropriate discipline for McNatt. (*Id.*).

Unlike these incidents, Plaintiff repeatedly made offensive and inappropriate comments while on-duty. *See Maniccia,* 171 F.3d at 1369 (female plaintiff with at least four policy violations not similarly situated to male employees who each committed a single policy violation). Moreover, Plaintiff's comments prompted security concerns and an FBI investigation (as discussed below, Plaintiff agrees that reporting his comments to the FBI was reasonable). Dekker's and McNatt's comments did not give rise to similar security concerns. Plaintiff also lied about making the statements and showed no remorse or contrition when asked about them. *See id.* (proposed comparators not similarly situated where, unlike plaintiff, there was no evidence they lied about misconduct). Plaintiff's denials contradicted the reports of numerous pilots and other NetJets' employees and provided an additional, alternative ground for his termination.[7] (DE 45-23, Arbitration testimony of Alan Bobo, at 330-31).

Donwerth is also not similarly situated to Plaintiff because his misconduct was not of the same type. *See Burke-Flower,* 447 F.3d at 1325 (different types of misconduct may warrant different types and degrees of discipline). Plaintiff was placed on extended administrative leave and terminated because he made concerning and inappropriate comments while on duty and, after a lengthy investigation, NetJets concluded Plaintiff lied about making the comments. Neither situation involved flight proficiency issues. Donwerth's issues, in contrast, related to his technical performance as a pilot. (DE 42-2 at 188-203). NetJets addressed his capability issues through a temporary change in duty

---

[7] NetJets' answers to interrogatories reveal that it fired at least eight other pilots—who presumably were not in Plaintiff's protected class—for dishonesty. *See* (DE 42-2 at 5-6).

status from pilot in command to second in command, and directed that he undergo fifty hours of additional operating experience. (*Id.*).

The decision makers involved in Donwerth's case were also different than the decision makers in Plaintiff's case. Bill Noe, who made the decision to place Plaintiff on paid administrative leave, was the president of NJI, Inc. in South Carolina in 2007 and had no role in Donwerth's discharge. *See* (DE 45-10 at 11:17-14:11; DE 42-2 at 200-03). Likewise, Bobo, who made the decision to terminate Plaintiff, had no involvement in Donwerth's case. (DE 49-1 ¶ 10).

As for the final comparator–the unnamed pilot acquitted of unknown criminal charges–he too was not "involved in or accused of the same or similar conduct" as Plaintiff. *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998). Furthermore, Eric Lampert, who made the decision to reinstate the unnamed pilot, was not a decision maker in Plaintiff's matter. *See Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination"). Thus, he is also not a valid comparator for demonstrating pretext.

Plaintiff further argues that in the cases of Dekker, McNatt, and Donwerth, NetJets conducted, and concluded, its investigations much more quickly than in his case. But as discussed, Plaintiff's case was entirely different than the proposed comparators' cases. It raised security concerns and was referred to the FBI. It also required an investigation that involved more than fifteen interviews and the special consideration of senior level management at NetJets. And, as discussed in more detail below, NetJets has offered legitimate, non-discriminatory reasons for the delay in resolving Plaintiff's case. Finally,

the argument that NetJets unreasonably delayed in concluding its investigation is irrelevant to the legitimate, non-discriminatory conclusion it ultimately reached: Plaintiff made offensive and concerning comments while on duty, and then lied about making them during his CRB.

Based on these distinguishing factors, if the Court were to consider these comparators in evaluating pretext, it would be doing precisely what the Eleventh Circuit warned against in *Burke-Fowler*; it would be "second-guessing employers' reasonable decisions and confusing apples with oranges." Accordingly, the Court finds that Plaintiff has not presented sufficient evidence of similarly situated comparators to create a genuine issue of material fact on the issue of pretext.[8]

### ii.     Plaintiff's Other Attempts To Show Pretext Fail

Plaintiff's other attempts to show that his extended administrative leave and termination were "more likely than not" motivated by discriminatory or retaliatory animus are similarly unconvincing.

Plaintiff first argues that NetJets' reason for initially placing him on administrative leave—"security concerns" arising from numerous reports that he made alarming and offensive statements while on duty—"defies belief" given the results of the initial interviews and the eight-month delay in placing him on leave from the time it received the initial compliant. But Plaintiff has repeatedly asserted that he "does not contend that NetJets' initial decision to contact the FBI was unreasonable in light of the initial

---

[8]The issues with Plaintiff's proffered comparators would also apply to Plaintiff's *prima facie* showing of discrimination. As noted at the outset, however, the Court need not review that deficiency in depth because, even if Plaintiff had satisfied the *prima facie* requirement under the *McDonnell Douglas* framework, he has failed to show that NetJets' reasons for his administrative leave and termination were pretextual.

allegations." (DE 47 at 10); *see also* (DE 41 at 13) ("Mr. Siddiqui never alleges (and has not asserted in any other filing) that NetJets' decision to report him the FBI was unreasonable or improper in any way."). The Court agrees with NetJets that it is contradictory for Plaintiff to assert that it was reasonable for NetJets to contact the FBI so the FBI could investigate, while at the same time arguing that NetJets' decision to place him on paid administrative leave was discriminatory. The same events—Plaintiff's repeated comments to crewmembers—were the motivating factor behind NetJets' decision to contact the FBI and to place Plaintiff on paid administrative leave. And although NetJets' delay in placing Plaintiff on leave following the initial round of interviews may reflect a lack of efficiency, Plaintiff does not explain how this delay evinces unlawful discrimination.

Plaintiff similarly attacks NetJets' delay in conducting his CRB and ultimately terminating him. He points to evidence that NetJets' Labor Department conducted other CRBs in the same time period.[9] Once again, Plaintiff's argument is unavailing because these delays are not evidence of discrimination. Indeed, Plaintiff does not dispute that

---

[9] Plaintiff identifies several instances where NetJets conducted other CRBs while allegedly delaying his. But of the eight CRBs Plaintiff references, three occurred *after* his April 1, 2015 CRB and a fourth occurred while NetJets was scheduling Plaintiff's CRB. Because NetJets' proffered reasons for delaying Plaintiff's CRB—including its negotiations with the pilots' labor unions and other employee groups and changes in key management positions—occurred before these CRBs were conducted, they are not relevant in showing that NetJets unreasonably delayed Plaintiff's CRB. Of the remaining four, two involved a single incident that was investigated by flight operations employees as an owner's complaint. The fact that an owner was involved necessitated a prompt response. The remaining two involved operational issues (medical fitness for flight duty and crew schedule) that were investigated by flight operations personnel and did not require the involvement of Mark Okey, who was responsible for conducting CRBs involving more serious matters, such as Plaintiff's. *See* (DE 42-2 at 183-86; DE 47-1 at 9-11, 12-15, 31-36, 37-42, 49-52, 53-44; DE 45-16).

there is no evidence of intentional delay. Instead, NetJets has provided legitimate, non-discriminatory reasons for the gaps in action that—while reflecting poorly on NetJets' labor management for that period—show that discrimination was not to blame.

For example, after reporting the matter to the FBI, NetJets waited for the outcome of the investigation. NetJets acknowledges that after the FBI concluded its investigation, it did not promptly conduct Mr. Siddiqui's CRB hearing, but it has offered evidence that during 2014 and 2015, its management was involved in contentious negotiations with the pilots' union as well as several other employee groups. The negotiations occupied a large amount of the labor relations department employees' time, including Mark Okey, Vice President for Labor Contract Compliance. Okey and other individuals in the labor relations department were responsible for conducting review boards for more serious matters, such as Mr. Siddiqui's. Several other factors also contributed to the passage of time after the CRB, including changes in key management positions at NetJets. In July 2015, Alan Bobo became the Director of Operations, the position ultimately responsible for managing flight crews. Finally, once the EEOC issued its Dismissal and Notice of Rights letter on May 11, 2016, NetJets moved more expeditiously to address Mr. Siddiqui's employment status. NetJets approached Mr. Siddiqui about resolving the matter and the parties engaged in settlement discussions until August of 2016. When negotiations reached an impasse, Mr. Siddiqui was terminated. Although the Court agrees with Plaintiff that NetJets could have resolved his case faster, in light of NetJets' legitimate, non-discriminatory reasons for the delay, and in the absence of any evidence of intentional delay or discrimination, these delays do not demonstrate pretext.

Plaintiff also asserts that NetJets treated him unfairly at his CRB by failing to provide context for the questions they asked him. He argues that his proffered comparators were confronted with the exact wording of their inappropriate comments, but he was not. But the record of the CRB demonstrates that Plaintiff had more than enough context to answer the panel's questions, which included:

- Have you made remarks about Jewish people or the Jewish religion while on duty?

- Have you made remarks to co-workers about Jews being responsible for the 9/11 attacks, and other world problems?

- Did you state to co-workers that the "US military are the true terrorists?"

- Did you ever make comments to co-workers about a Jewish owner, who owns the World Trade Center, stating that this Owner and the US government masterminded bringing down the World Trade Center for purposes of implicating Pakistan?

(DE 45-18 at 1-4). Plaintiff twice answered no to each of these questions. (*Id.*; DE 52 at 8). Plaintiff should have been prepared for these questions, because, among other reasons, the email scheduling the CRB informed him that he would be asked about "derogatory statements [he had made] regarding different religions (anti-Semitic comments) and national origins." (DE 42-2 at 105). In addition, Plaintiff has always steadfastly denied ever making the comments, even after being provided with the exact wording of the comments during the arbitration and this litigation. *See* (DE 45-1 at 157-64, 170-71; DE 45-34 at 402, 404, 410, 414, 427, 431, 434, 437, 439-44). As a result, the Court cannot agree that the questions asked during the CRB negatively affected the outcome of the investigation or reflected a discriminatory animus on the part of NetJets.

Finally, Plaintiff argues that NetJets' "reasons for termination likewise reveal inconsistencies." He asserts that the final Report of Investigation (ROI)—which was

issued by all four members of the CRB and unanimously recommended Plaintiff's termination—is "biased" because it: does not include Hyman's statement after the initial rounds of interviews that, despite the comments the pilots reported, they believed Mr. Siddiqui was not a security threat; does not reflect that Mr. Siddiqui was not provided sufficient context for the questions he was asked; unfairly paints Mr. Siddiqui as "dismissive" of the CRB process; and fails to mention the "rather large break" taken in the middle of the CRB. (DE 47 at 15-16).

The Court disagrees. As discussed, the record of the CRB plainly contradicts Mr. Siddiqui's argument that he was not provided sufficient context for the questions the CRB panel asked him. That the ROI did not mention (i) the statement from Hyman's August 2016 notes that the pilots interviewed did not consider Mr. Siddiqui a security "threat" and (ii) the break during the middle of the CRB also does not show discriminatory animus. Mr. Siddiqui was ultimately terminated because NetJets concluded he had made the inappropriate comments and then lied about making them. Consequently, the statement from Hyman's August 2016 notes was not key to the CRB's investigation and conclusion, and the failure to include it therefore does not show discrimination.[10] And Mr. Siddiqui fails to explain why the break during the CRB evinces discrimination. For its part, NetJets contends that the break was taken so Mr. Siddiqui could confer with his representatives. As for the assertion in the ROI that Mr. Siddiqui was dismissive of the CRB process, that

---

[10] Based on his experience that bravado was not uncommon among pilots, Bill Noe testified that he disagreed with Hyman's statement. (DE 45-10 at 107:6-109:7). Noe also felt there was a contradiction in a pilot "basically saying on the one hand I'm very concerned and I told my wife that if anything happened it's because of this guy. Ah, but I think he's pretty harmless." (*Id.* at 110:1-5).

statement similarly does not demonstrate unlawful discrimination; indeed, Mr. Siddiqui concedes that he became upset when he was asked certain questions twice.

Instead of demonstrating any discriminatory or retaliatory animus, the ROI, and the record as a whole, establish that Plaintiff was terminated for making anti-Semitic and other concerning and offensive comments, failing to acknowledge his inappropriate conduct, and lying about making those comments during his CRB hearing. Plaintiff has failed to present sufficient evidence that NetJets' legitimate, non-discriminatory reasons for his termination were pretextual, and thus summary judgment is appropriate.

"'[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" "A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks*, 446 F. 3d at 1163 (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Plaintiff's repeated denials at his CRB directly conflicted with the testimony of at least six different pilots–all of whom remembered Plaintiff making the offensive and inappropriate statements. Courts have consistently held that an employee's dishonesty constitutes a legitimate, non-discriminatory basis for termination. *Boyland v. Corr. Corp. of Am.*, 390 Fed. Appx. 973, 975 (11th Cir. 2010) (violating work policy and lying during subsequent internal investigation were non-discriminatory reasons for termination); *Dumery v. Kissimmee Utility Auth.*, No. 6:11-cv-862-ORl-22DAB, 2012 WL 12896535, *6 (M.D. Fla. Aug. 6, 2012) (plaintiff's lying about conduct he knew was unacceptable in an attempt to cover it up was a legitimate, non-discriminatory reason for termination).

To be sure, NetJets failed to expeditiously and efficiently resolve Plaintiff's matter. But there is no evidence in the record showing that this failure was the result of unlawful discrimination or retaliation. A court's ". . . inquiry is limited to whether the employer gave an honest explanation" for the adverse action. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (granting judgment notwithstanding jury's verdict in favor of defendant, noting that "[plaintiff] may have convinced the jury that the allegations against him were untrue, but he certainly did not present evidence that [defendants'] asserted belief in those allegations was unworthy of credence"). It is insufficient for Plaintiff to rely on irregularities in the process without showing that the alleged deviations were motivated by his race or national origin. *Labady v. Gemini Air Cargo, Inc.*, 350 F. Supp. 2d 1002, 1014 (S.D. Fla. 2004) (quoting *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)). NetJets has provided evidence that each of its employment actions towards Plaintiff were motivated or caused by legitimate, non-discriminatory reasons. Plaintiff fails to show these reasons were pretextual. Accordingly, NetJets' motion for summary judgment is granted.

**B.** **Plaintiff's Retaliation Claim Fails For Similar Reasons: Plaintiff Cannot Show A Causal Link Or Pretext**

In addition to discriminating against him, Plaintiff also alleges NetJets unreasonably extended his suspension, and ultimately terminated his employment, in retaliation for protected internal complaints and external charges of discrimination. A plaintiff articulates a *prima facie* retaliation claim by showing that "(1) [he] engaged in protected activity, such as opposing an unlawful employment practice; (2) [he] suffered an adverse employment action; *and* (3) a causal connection exists between the activity and adverse action." "[R]etaliation claims must be proved according to the traditional

principles of but-for causation, not the lessened causation test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533.

Plaintiff claims he complained about NetJets' discriminatory and retaliatory acts on February 16, 2015 via correspondence to NetJets' in-house counsel, in person at the CRB on April 15, 2015, and on April 29, 2015, via filing the First COD with the EEOC. Plaintiff also filed a charge of discrimination with the EEOC on April 29, 2015, alleging NetJets discriminated and retaliated against him.

To begin, Plaintiff's placement on paid administrative leave for security concerns occurred well before any of his protected activity and therefore cannot be the "but for" cause of the alleged adverse consequences. *See EEOC v. Total Sys. Svcs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000). Plaintiff also alleges that NetJets convened the CRB as retaliation in response to its receipt of the February 16, 2015 correspondence from his counsel. By that time, however, NetJets was already in the process of scheduling a CRB for Plaintiff. On January 29, 2015, for example, Jennifer Beale, NetJets' Assistant General Counsel, emailed Plaintiff's union counsel, Sonya Cook, advising that NetJets was working on scheduling the CRB. Although the CRB did not take place until the first of April, the process of scheduling the CRB was already underway by the time NetJets received the letter. This lawsuit also could not have served as the impetus for his termination, as NetJets did not become aware of the lawsuit until after Plaintiff's employment had already been terminated. (DE 50 ¶ 18). Finally, for the reasons discussed above, even if Plaintiff could establish a *prima facie* case of retaliation, he

cannot show that NetJets' reasons for its action were pretextual. Consequently, NetJets' motion for final summary judgment is granted.

## IV.    CONCLUSION

For the foregoing reasons, the Court **ORDERS AND ADJUDGES** that:

1.     Defendant's motion for final summary judgment (DE 44) is **GRANTED.** Defendant is entitled to final summary judgment on all claims in Plaintiff's amended complaint.

2.     Plaintiff's motion for partial summary judgment (DE 42) is **DENIED.**

3.     All other pending motions are **DENIED AS MOOT**.

4.     All deadlines and trial settings are **CANCELED.**

5.     The Clerk is **DIRECTED** to **CLOSE** this case.

6.     The Court will enter final summary judgment separately pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE AND ORDERED** in chambers in Miami, Florida, this 23rd day of July, 2018.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE